UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MIC GENERAL INSURANCE CORPORATION,

                               Plaintiff,

          -against-

SYED S. QADRI and SATINDER KAUR,

                              Defendants.
----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
21-CV-640-SJB

**BULSARA, United States Magistrate Judge:**

This lawsuit is an insurance coverage dispute relating to an ongoing litigation pending in New York Supreme Court, Queens County (the "Underlying Action").[1]  In that Underlying Action, Satinder Kaur sued Syed S. Qadri and Quality Medical Providers, PC ("Quality Medical") for personal injuries she allegedly sustained on the exterior steps of 104-37 Lefferts Boulevard, South Richmond Hill, New York (the "Premises").[2]  MIC General Insurance Corporation ("MIC") agreed to provide homeowner's insurance for the location, but contends that Qadri and Quality Medical were using the Premises not as a residence, but as a business.  Citing to a number of policy exclusions and definitions, MIC contends that it is not, as a matter of law, required to provide defense coverage to Qadri.  Qadri contends the opposite, arguing that the policy, as a matter of law, requires defense coverage.  Because the Court

---

[1] Compl., Dkt. No. 1 ¶¶ 4, 9; Pl.'s Rule 56.1 Statement of Material Facts, attached as Ex. 16 to Pl.'s Mot. for Summ. J. filed July 28, 2022, Dkt. No. 23 *and* Pl.'s Resp. to Def.'s Rule 56.1 Counterstatement of Material Facts, Dkt. No. 25 (together, "Pl. 56.1 Stmt.") ¶¶ 1–2, 6; Def.'s Rule 56.1 Counterstatement of Material Facts ("Def. 56.1 Stmt."), attached as Ex. 1 to Def.'s Cross-Mot. for Summ. J. filed July 28, 2022, Dkt. No. 24 ¶¶ 1–2, 6.

[2] Compl. ¶¶ 10, 12.

concludes that there is an issue of material fact as to whether an exception to the exclusion of business coverage applies, the parties' respective cross-motions for summary judgment are denied.[3]

STANDARD FOR SUMMARY JUDGMENT

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party."  *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  "This is true even though the court [is] presented with cross-motions for summary judgment; each movant has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor."  *Barhold v. Rodriguez*, 863 F.2d 233, 236

---

[3] Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), Dkt. No. 23; Def.'s Cross-Mot. for Summ. J. ("Def.'s Cross-Mot."), Dkt. No. 24.  As noted on the docket, (Order dated Nov. 29, 2021), Kaur is only a nominal defendant in the case, against whom MIC has asserted no claim.  The reference to Defendant's motion is to the cross-motion for summary judgment filed solely by Qadri.

(2d Cir. 1988).  "[T]he fact that both parties have moved for summary judgment does not mean that the Court must grant summary judgment for one of the parties, and it does not change the burden on the moving party to show the absence of a genuine issue of fact.  Each party's motion must be evaluated on its own merits and all reasonable inferences must be drawn against the party whose motion is under consideration." *Wagner v. Cnty. of Cattaraugus*, 866 F. Supp. 709, 714 (W.D.N.Y. 1994) (citing *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir. 1988) and *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways.  Fed. R. Civ. P. 56(c)(1).  It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials."  *Id*. R. 56(c)(1)(A).  Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id*. R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b).  In both instances, the party must support its position by citing to admissible evidence from the record.  *Id*. R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts

3

from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole— weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). "Legal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The Court must also disregard conclusory denials that lack citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions[.]" (emphasis in original)), *aff'd*, 56 F. App'x 27 (2d Cir. 2003). Further, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c). The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in

4

evaluating declarations or affidavits.  *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139 (2d Cir. 2009).

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

The following facts—drawn from the pleadings, the parties' respective Rule 56.1 statements, and supporting affidavits and exhibits attached thereto—are, unless otherwise noted, undisputed.

On October 13, 2020, Satinder Kaur began the Underlying Action against Qadri and Quality Medical for injuries she sustained on November 7, 2019 on the front exterior steps of the Premises, alleging negligence, willful, wanton, and gross negligence, carelessness, and want of proper care.  (Pl. 56.1 Stmt. ¶¶ 1, 3; Def. 56.1 Stmt. ¶¶ 1, 3). She alleged Qadri and Quality Medical owned, operated, and managed the Premises, and were responsible for the dangerous and defective condition of the exterior front steps of the Premises.  (*Id.* ¶¶ 2, 4; Pl. 56.1 Stmt. ¶¶ 2, 4).  At the time of the accident, the Premises served, at least in part, as an office for Quality Medical, Qadri's family medical practice.  (*Id.* ¶ 28; Def. 56.1 Stmt. ¶ 28).

MIC issued a homeowner's insurance policy to Qadri (the "Policy") for the Premises for the period of November 8, 2018 through November 9, 2019.  (*Id.* ¶ 5; Policy, attached as Ex. 13 to Pl.'s Mot.; Pl. 56.1 Stmt. ¶ 5).  The Policy provides coverage

to Qadri for, among other things, personal injuries suffered on the Premises by third parties. (Policy at 59). It provides that "[i]f a claim is made or a suit is brought against an 'insured' for damages because of 'bodily injury' . . . caused by an 'occurrence' to which this coverage applies," MIC is required to indemnify and provide a defense to Qadri in any litigation. (*Id.*). The Policy includes exclusions to this coverage, two of which are relevant here.

*First*, the Policy does not provide coverage for injuries suffered on the Premises arising out of "business pursuits of an insured" (the "Business Exclusion") or "the rental or holding for rental of any premises by an insured" (the "Rental Exclusion"). (*Id.* at 70 (quotations omitted); Pl. 56.1 Stmt. ¶ 10; Def. 56.1 Stmt. ¶ 10). This exclusion contains an exception (the "Office Rental Exception"), and does not apply to:

> (1) Activities which are usual to non-"business" pursuits; or
> (2) *The rental or holding for rental of an "insured location"*:
>> (a) On an occasional basis if used only as a residence;
>> (b) In part for use only as a residence unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or
>> (c) *In part, as an office*, school, studio, or private garage[.]

(*Id.* (emphasis added); Policy at 70; Pl. 56.1 Stmt. ¶ 10). *Second*, the Policy excludes coverage for any injuries occurring at a non-"insured location" (the "Insured Location Exclusion"). (*Id.* ¶¶ 7, 10; Policy at 59; Def. 56.1 Stmt. ¶¶ 7, 10). The Policy provides that "insured location" includes the "residence premises," namely the "the one family dwelling, other structures, and grounds; or that part of any other building; where [Qadri] reside[s] and which is shown as the 'residence premises' in the Declarations." (*Id.* ¶ 9; Policy at 58; Pl. 56.1 Stmt. ¶ 9).

Qadri, a licensed physician, is the president and a shareholder of Quality Medical. (*Id.* ¶¶ 27, 29, 65; Def. 56.1 Stmt. ¶¶ 27, 29, 65). He purchased the Premises

in 2008 in his own name, converting one-third of the three-story house into a medical office.  (*Id.* ¶¶ 43–45; Pl. 56.1 Stmt. ¶¶ 43–45).  Beginning in 2008 and until the time of Kaur's accident, the ground floor of the Premises served as a medical office for Quality Medical.  (*Id.* ¶¶ 16, 28, 45, 57; Def. 56.1 Stmt. ¶¶ 16, 28, 45, 57).  A photograph of the front exterior of the Premises depicts a blue awning labeled with the written words: "Quality Medical Provider, P.C.: Syed S. Qadri, M.D., D.O., FAAFP."  (*Id.* ¶ 41; Google Maps Image, attached as Ex. 11 to Pl.'s Mot.; Pl. 56.1 Stmt. ¶ 41).  On January 1, 2017, Qadri entered into a written five-year commercial lease of the Premises with Quality Medical (the "Lease"), signing the contract on its behalf.  (*Id.* ¶¶ 30, 33; Commercial Lease Agreement, attached as Ex. 8 to Pl.'s Mot., at 1; Def. 56.1 Stmt. ¶¶ 30, 33).  Qadri, as owner and lessor, took responsibility for maintenance of the Premises.  (*Id.* ¶¶ 31–32; Pl. 56.1 Stmt. ¶¶ 31–32; Dep. Test. of Syed S. Qadri on Aug. 13, 2021 ("Qadri Dep."), attached as Ex. 5 to Pl.'s Mot., at 24:22–25, 26:7–11).  The Lease provided that "[t]he Premises shall be used and occupied only as a retail shop and for no other purpose."  (Commercial Lease Agreement § 3.1).  At the time of Kaur's accident, the basement was only accessible through Quality Medical, and the exterior front staircase to the Premises—where Kaur was injured—was the only means of ingress and egress to the building.  (Pl. 56.1 Stmt. ¶¶ 39–40, 52–53; Def. 56.1 Stmt. ¶¶ 39–40, 52–53).  In a recorded statement, Qadri stated Kaur's "accident happened at [his] warehouse," which has a medical office within it because he is "a doctor, so [he is] using that space for [his] medical office."  (*Id.* ¶ 15; Recorded Statement of Syed S. Qadri ("Qadri Recorded Statement"), attached as Ex. 14 to Pl.'s Mot., at 2–3; Pl. 56.1 Stmt. ¶ 15).  When asked for his "home address," Qadri provided an address different from the Premises—191-11 Foothill Avenue, Hollis, New York 11423—and stated that is

"where I reside, and I get all the mail." (*Id.* ¶ 14, Def. 56.1 Stmt. ¶ 14; Qadri Recorded Statement at 1–2).

However, Qadri also indicated in his recorded statement that he is "never" at the Foothill Avenue address. (*Id.* at 2). He has alternatively referred to the Premises as a "one-family residence," with a "medical office in that residence." (*Id.*; Pl. 56.1 Stmt. ¶ 15; Def. 56.1 Stmt. ¶ 15). He stated that he "live[s] in that house, too" and "use[s] that house for living also." (*Id.* ¶ 55; Qadri Recorded Statement at 2–3; Pl. 56.1 Stmt. ¶ 55). And "occasionally," his wife joins him. (*Id.* ¶ 59; Qadri Recorded Statement at 3; Def. 56.1 Stmt. ¶ 59). Qadri noted that the Premises has three floors—the basement contains a bedroom and a full bathroom with a shower; the ground (first) floor is the medical office; and the second floor has two rooms, including a kitchen and storage space for personal and business purposes. (*Id.* ¶¶ 46–48, 57, 60; Qadri Recorded Statement at 5; Pl. 56.1 Stmt. ¶¶ 46–48, 57, 60). The medical office comprises one-third of the Premises, while the living quarters—which are found in the basement and on the second floor, and consist of a living area, kitchen, and living room—are two-thirds of the Premises. (*Id.* ¶¶ 56, 58; Qadri Recorded Statement at 2–3; Def. 56.1 Stmt. ¶¶ 56, 58). Sometimes they live in the basement, and other times they stay "on the top." (*Id.* ¶ 56; Qadri Recorded Statement at 3; Pl. 56.1 Stmt. ¶ 56). And when asked how often he stays in the living quarters, Qadri replied, on "the weekend sometimes" or "[s]ometimes [during] the week, depend[ing] on the workload. If there's too much work, I stay there." (*Id.* ¶¶ 18, 59; Def. 56.1 Stmt. ¶¶ 18, 59; Qadri Recorded Statement at 3). Qadri further averred that he receives personal mail at the Premises. (Decl. of Syed S. Qadri ("Qadri Decl."), attached as Ex. 5 to Def.'s Cross-Mot., ¶ 10).

Kaur was employed by WellCare—a health insurance company—not Qadri directly.  (Def. 56.1 Stmt. ¶¶ 19, 49; Qadri Recorded Statement at 7; Pl. 56.1 Stmt. ¶¶ 19, 49).  She was at the Premises on the day of the accident to enroll patients in WellCare's medical insurance.  (*Id.* ¶¶ 34, 50; Def. 56.1 Stmt. ¶¶ 34, 50).  MIC contends that although Kaur may not have been Qadri's employee, she was enrolling his patients.  (Pl. 56.1 Stmt. ¶¶ 19, 34, 36; Qadri Dep. at 36:22–37:6; Qadri Recorded Statement at 7–8).  In response, Qadri says that Kaur was only enrolling patients for insurance generally—not exclusively patients belonging to Qadri—and Qadri received no profits from Kaur's work.  (*Id.* at 7; Def. 56.1 Stmt. ¶¶ 19, 34, 50).  MIC alleges that, nonetheless, Qadri derived some benefit from her presence and work at the Premises, since it is uncontested that she was his invitee and was unaware of any other doctors or services being provided at the Premises.  (*Id.* ¶ 36; Qadri Dep. at 36:22–37:6; Pl. 56.1 Stmt. ¶¶ 36, 50).

MIC received notice of Kaur's claim and lawsuit on November 5, 2020.  (*Id.* ¶ 11; Def. 56.1 Stmt. ¶ 11).  After conducting an investigation, MIC concluded Kaur's injuries fell within the Policy's exclusions to coverage, namely: (a) the injuries arose out of Qadri's medical practice, a "business"; (b) they also arose out of Qadri's rental of the Premises to Quality Medical; and (c) MIC believed that coverage was inappropriate because Kaur's accident took place at Qadri's medical practice—not at his residence—and therefore not an insured location.  (*Id.* ¶¶ 21–25; Pl. 56.1 Stmt. ¶¶ 21–25).  On November 25, 2020, MIC disclaimed coverage for Kaur's injuries.  (*Id.* ¶ 26; Def. 56.1 Stmt. ¶ 26; Disclaimer, attached as Ex. 15 to Pl.'s Mot., at 1).

MIC commenced this action on February 5, 2021, seeking a declaration that (1) it is not obligated to provide Qadri with coverage under the insurance policy for Kaur's

claims; and (2) it may withdraw from the defense it is providing Qadri in the Underlying Action. (Compl. ¶¶ 5–6).

DISCUSSION

"[U]nder New York law, 'the insurer's duty to furnish a defense is broader than its obligation to indemnify.'" *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 620 (2d Cir. 2001) (quoting *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 310 (1984)). "[S]o long as the claims asserted against the insured may rationally be said to fall within policy coverage, whatever may later prove to be the limits of the insurer's responsibility to pay, there is no doubt that it is obligated to defend." *Id.* (emphasis omitted) (quotations omitted). Said differently, the duty to defend "perdures until it is determined *with certainty* that the policy does not provide coverage." *Id.* (emphasis in original). Conversely, "[t]here are, of course, cases in which the policy is so clear that there is no uncertainty in fact or law, and hence no duty to defend." *Id.* And so, "[a]t the summary judgment stage, a plaintiff [insurer] is entitled to a declaratory judgment that it has no duty to indemnify if it can prove that there is no material question of fact as to whether there was coverage." *Allstate Ins. Co. v. Weiner*, No. 19-CV-499, 2023 WL 2403625, at *3 (E.D.N.Y. Mar. 8, 2023). That amounts to demonstrating that "there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision." *Stein v. N. Assurance Co. of Am.*, 617 F. App'x 28, 30 (2d Cir. 2015) (quoting *Frontier Insulation Contractors, Inc. v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997)).

A.   Qadri's Motion for Summary Judgment

Though labelled as a cross-motion for summary judgment, Qadri's motion, with one exception addressed here, merely raises arguments why MIC is not entitled to

summary judgment.  (*See* Def.'s Mem. in Opp'n to Pl.'s Mot. & in Supp. of Cross-Mot. ("Def.'s Mem."), attached as Ex. 11 to Def.'s Cross-Mot., at 12–18).

Qadri contends MIC waived its ability to object to coverage because it failed to investigate an omission he made on the application before the Policy was issued.  (*Id.* at 8–10).  In particular, Qadri answered "[n]o" as to whether "any business [was] conducted on the premises (except permitted incidental occupancies)," and failed to answer whether there was to be "[a]ny farming or other business conducted on premises (including day/child care)."  (Pl. 56.1 Stmt. ¶ 67; Def. 56.1 Stmt. ¶ 67).  His argument has no merit.

Qadri's argument, taken to its logical conclusion, would permit an insured to omit information, and then use that omission as a defense to the insurer's refusal of coverage.  The waiver principle does not operate in that fashion.  An insured can argue that the insurer waived any ability to deny coverage *only* if the insurer relies on the existence of the omission to deny coverage.  The cases cited by Qadri himself make this plain.  *E.g.*, *Axis Reinsurance Co. v. Bennett*, No. 07-CV-7924, 2008 WL 2485388, at *11 (S.D.N.Y. June 19, 2008) (holding that, where question in insurance application was not answered and insurer did not inquire further, insurer "waive[d] . . . any objection to coverage based upon [the] failure to answer"); *Phila. Indem. Ins. Co. v. Horowitz, Greener & Stengel, LLP*, 379 F. Supp. 2d 442, 453 (S.D.N.Y. 2005) ("[W]here upon the face of an insurance application, a question appears to be not answered at all, or to be imperfectly answered, and the insurers issue a policy without further inquiry, they *waive the want or imperfection in the answer*, and render the omission to answer more fully immaterial." (emphasis added)).

This is not such a situation.  Although MIC initially alleged Qadri's concealment or misrepresentation in the application as a basis for denial, (*see* Compl. ¶¶ 53–62), MIC has since abandoned the argument on summary judgment.  (*See* Pl.'s Mem. in Opp'n to Def.'s Cross-Mot. & in Further Supp. of Pl.'s Mot. ("Pl.'s Reply"), Dkt. No. 26 at 10 ("MIC General is no longer pursuing a disclaimer of coverage based upon Qadri's omission of information in his application.")).  Furthermore, MIC is not attempting to rescind the Policy, or void it, due to any representations made during the application process; it seeks to enforce the Policy and use the exclusions contained within it to deny coverage.

The remaining arguments in Qadri's cross-motion are addressed in the context of MIC's motion.

B.  <u>MIC's Motion for Summary Judgment</u>

MIC argues it is entitled to summary judgment, for three principal reasons: coverage is precluded because (1) Kaur's injuries fall under the Business Exclusion because they arose from Qadri's business pursuits in operating his medical practice, (*see* Mem. of Law in Supp. of Pl.'s Mot. ("Pl.'s Mem."), attached as Ex. 17 to Pl.'s Mot., at 14–18); (2) Kaur's injuries arose from Qadri's rental of the Premises to Quality Medical, which triggers the Rental Exclusion, (*id.* at 18–19); and (3) Qadri did not reside at the Premises, so the Premises does not qualify as an "insured location."  (*Id.* at 19–22).  But there is a genuine dispute of material fact as to whether an exception to the Business and Rental Exclusions, namely the Office Rental Exception, applies.  There are also issues of material fact as to whether the Premises was an "insured location," because of the competing facts about Qadri's use of the location.  As such, MIC is not entitled to summary judgment.

"The law governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds." *Beazley Ins. Co. v. ACE Am. Ins. Co.*, 880 F.3d 64, 68 (2d Cir. 2018) (quoting *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 306 (2009)). If an "insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language." *Id.* at 69 (quotations omitted). As such, policy exclusions are given a "strict and narrow construction," *id.* (quotations omitted), with the burden of proving the exclusion resting on the insurer. *Crescent Beach Club LLC v. Indian Harbor Ins. Co.*, 468 F. Supp. 3d 515, 541 (E.D.N.Y. 2020).

The first step in determining "whether an insured's loss falls within a policy exclusion is to 'examine whether there is a "reasonable basis for a difference of opinion as to the meaning of the policy."'" *7001 E. 71st St., LLC v. Cont'l Cas. Co.*, 739 F. App'x 37, 38 (2d Cir. 2018) (first quoting *U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.*, 823 F.3d 146, 150 (2d Cir. 2016); and then quoting *Fed. Ins. Co. v. Int'l Bus. Machs. Corp.*, 18 N.Y.3d 642, 646 (2012)); *see also MIC Gen. Ins. Co. v. Allen*, 697 F. App'x 717, 718–19 (2d Cir. 2017) ("The policy will be deemed ambiguous and interpreted in favor of the insured only if, after 'affording a fair meaning to all of the language employed by the parties . . . and leaving no provision without force and effect,' there is a 'reasonable basis for a difference of opinion as to the meaning of the policy.'" (quoting *Fed. Ins. Co.*, 18 N.Y.3d at 646)); *Crescent Beach Club*, 468 F. Supp. 3d at 542 ("Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent or where its terms are subject to more than one reasonable interpretation."

(quotations omitted)).[4]  Courts must look to "the language of the disputed . . . provision itself" and are not "free to disregard the plain meaning of the policy language to find an ambiguity where none exists."  *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, -- F.4th --, No. 21-2570, 2023 WL 2589389, at *4 (2d Cir. Mar. 22, 2023) (quotations omitted).  "'[T]he question is not simply whether the insurer could have phrased the provision differently' but 'whether the provision, as written, is sufficiently clear and precise' in light of the reasonable expectations of the average policy holder and the language of the policy as a whole."  *Allen*, 697 F. App'x at 720 (quoting *Fed. Ins. Co.*, 18 N.Y.3d at 650).  In other words, "to negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that could fairly be placed thereon."  *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quotations omitted).

Second, "[o]nce a court concludes that an insurance provision is ambiguous, 'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'"  *Id.* at 43 (quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275–76 (2d Cir. 2000)).  "[T]he court may resolve ambiguity in contractual language as a matter 'of law' if the evidence presented about the parties' intended meaning is so one-sided that no reasonable

---

[4] This question of ambiguity is one for the Court.  "It is well-settled that interpretation of an insurance agreement is a question of law, as is the question of whether an insurance provision is clear or ambiguous."  *Crescent Beach Club*, 468 F. Supp. 3d at 540 (quotations and citations omitted).

person could decide the contrary." *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999) (quotations omitted).

If the extrinsic evidence, however, raises disputed issues of material fact, resolution of the ambiguity at summary judgment is inappropriate, *see Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946, 951 (2d Cir. 1965), and a trial should be held. *See Morgan Stanley Grp.*, 225 F.3d at 276 (recognizing trial is appropriate where "extrinsic evidence is available but inconclusive"); *e.g.*, *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 162 (2d Cir. 2003) ("If neither the 1983 Policy as a whole nor such extrinsic evidence as is proffered makes the parties' intent clear beyond rational dispute, trial may be required.").

Ultimately, "if the extrinsic evidence does not yield a conclusive answer as to the parties' intent, a court may apply other rules of contract construction, including the rule of *contra proferentem,* which generally provides that where an insurer drafts a policy any ambiguity in the policy should be resolved in favor of the insured." *Parks Real Est. Purchasing Grp.*, 472 F.3d at 43 (quotations omitted) (cleaned up). "This rule is especially applicable when the ambiguity is found in an exclusionary clause." *McCostis v. Home Ins. Co. of Ind.*, 31 F.3d 110, 113 (2d Cir. 1994). But *contra proferentem* is a doctrine of last resort to be used only after the consideration of extrinsic evidence. *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 88 n.7 (2d Cir. 2002) ("[W]e have made clear that under New York law, courts should not resort to [*contra proferentem*] until after consideration of extrinsic evidence.").

Here the dispute centers around the operation of the Office Rental Exception to the Business and Rental Exclusions to the Policy. To recap, MIC contends that Kaur's injuries occurred in connection with Qadri's operation of a medical practice on the

Premises.  As such, one of two policy exclusions preclude coverage: the Policy excludes coverage for injuries "[a]rising out of 'business' pursuits of an 'insured'" (the Business Exclusion), "or the rental or holding for rental of any premises by an 'insured'" (the Rental Exclusion).  (Policy at 59, 70).  But, Qadri contends that Kaur's injuries fall within the relevant Office Rental Exception to both of these exclusions:

> This exclusion does not apply to:
> (1) Activities which are usual to non-"business" pursuits; or
> (2) *The rental or holding for rental of an "insured location"*:
>     . . .
>         (c) *In part, as an office*, school, studio, or private garage[.]

(*Id.* at 70 (emphasis added); Def.'s Mem. at 11–12).  In other words, Qadri contends that though the Policy excludes coverage when the Premises is used as a business or rented to a third party, there is an exception when the rental is an "office," such as Qadri's medical practice.

MIC argues, however, that this Office Rental Exception does not apply to the Business Exclusion, and applies only to the Rental Exclusion.  (Pl.'s Reply at 6–8).  In other words, the only exception to the Business Exclusion is for "[a]ctivities which are usual to non-'business' pursuits."  (*Id.*; Policy at 70).  And the exception where "[t]he rental" is "[i]n part, as an office" applies only to the Rental Exclusion  (*Id.*; Pl.'s Reply at 6–8).  Thus, under MIC's reading, if an incident falls within the Business Exclusion, and is not saved by the "non-business pursuits" language contained within (1)—which it says is the case with Kaur's accident—coverage is precluded.  The Office Rental Exception offers no relief.

MIC's reading—carving up the exception and applying subsection (1) to the Business Exclusion and subsection (2) to the Rental Exclusion—is not the only

reasonable reading.  The Policy is, in fact, ambiguous as to whether it applies in this fashion.

Though the Court—to assist in understanding the parties' positions—refers to the Business and Rental Exclusions as two separate items, the Policy does not.  The exclusion in section (b) is referred to as a unitary, single one—*i.e.*, "[t]his exclusion." (Policy at 70).  Though it may seem that the distinction—between a singular exclusion with two components (either of which negates coverage) and two exclusions—is one without a difference, that is not the case here.  Because the Policy refers to a single exclusion, it would follow that the exception should apply to the entire exclusion, not to a portion.  In other words, the Office Rental Exception, on its own terms, is reasonably read to apply to *this exclusion*, not just to the Business Exclusion.

In *United Food Service, Inc. v. Fidelity & Casualty Company of New York*, a New York court interpreted an insurance provision that likewise "excluded from personal liability coverage bodily injury or property damage arising out of business pursuits of an insured or the rental or holding for rental of any part of any premises by an insured." 189 A.D.2d 74, 76 (3d Dep't 1993) (quotations omitted).  The policy also provided that "this exclusion" does not apply to "the rental or holding for rental of an insured location on an occasional basis if used only as a residence."  *Id.*  After finding that the plaintiff's injury arose out of a "business pursuit," the court then addressed applicability of the rental exception: "[W]e note that [the insurance company] disclaimed coverage only under the business pursuits portion of the relevant exclusion and, therefore, the rental exception does not appear to come into play.  In any event, we conclude that the rental exception is not applicable because Gagnon's hotel room does not appear to qualify as a 'residence' as that term is used in the policy and is commonly understood."  *Id.* at 77.  In

other words, the court addressed two different possibilities: (1) that the rental exception is irrelevant to the business exclusion (noting it "does not appear to come into play"); and alternatively (2) the rental exception could apply, but not under the facts presented. Given that at least one New York court—and an intermediate Appellate Division court, no less—did not reject the reading advanced by Qadri as unreasonable or implausible, this Court is unable to do so. *Covington Specialty Ins. Co.*, 2023 WL 2589389, at *4 ("[S]ince the district court was 'sitting in diversity,' it was bound to apply the substantive law of the forum state—here, New York. . . . [T]he district court was bound to apply the law as interpreted by New York's intermediate appellate courts unless it were to find persuasive evidence that the New York Court of Appeals would reach a different conclusion." (quotations and citations omitted) (cleaned up)).

    In other words, there is some ambiguity whether the Office Rental Exception applies to the entire exclusion. On the one hand, the Exception can be read to apply, because the Exclusion is not bifurcated into separate exclusions for which separate exceptions apply.[5] On the other hand, the Exception appears—as a logical and topical matter—to apply to the Rental Exclusion only (since there is a reason to continue homeowner's coverage even if the property is rented in part, if the rental involves a use typical to home ownership, like use as a home office). Moreover, there appears to be a separate exception to the Business Exclusion—the exception for "non-business

---

[5] Qadri makes a separate argument why MIC's reading is implausible (and thus why his reading is reasonable): if the Office Rental Exception applied only to the Rental Exclusion, and not to the Business Exclusion, the Exception would be rendered nugatory. (Def.'s Mem. in Further Supp. of Cross-Mot. ("Def.'s Reply"), Dkt. No. 27 at 4). That is because a home office is almost always, and by definition, used for a business purpose. And if the intent of the Exception was to allow coverage when someone rented their home for use as an office, that would be made impossible by the Business Exclusion—which by not excepting such use—would always preclude coverage.

pursuits"—and the Office Rental Exception is not combined with or referenced in that exception.

Having determined the language is ambiguous, the Court must turn to whether extrinsic evidence reveals the parties' intent at the time MIC issued the Policy.  So firm in its conviction that "[t]here is no such ambiguity," (Pl.'s Reply at 8), MIC neglected to provide the Court with any extrinsic evidence to resolve the ambiguity.  The Court notes that MIC's failure to provide the Court with any extrinsic evidence "may signal an actual absence of any extrinsic evidence," or merely MIC's view "that the contract itself is so clear that no further aids to its interpretation are necessary.  If the former, the policy must be construed in favor of the insured[.]"  *Twombly v. AIG Life Ins. Co.*, 199 F.3d 20, 25 (1st Cir. 1999).

There is some extrinsic evidence, here.  But neither party addresses it.  The exception to the exclusion was incorporated into the Policy through an endorsement.[6] (*See* Schedule "F" – Forms, Endorsements and Schedules, Policy at 28 (detailing special provisions for New York); *id.* at 70; Disclaimer at 4).  Side-by-side comparisons of the standard exclusion in the original Policy, and the Endorsement, are reproduced below.

---

[6] An endorsement is "[a]n amendment to an insurance policy; a rider." *Endorsement*, Black's Law Dictionary (11th ed. 2019).

1. **Coverage L-Personal Liability** and **Coverage M-Medical Payments to Others** do not apply to "bodily injury" or "property damage:"

   **a.** which is expected or intended by the "insured."

   **b.(1)** arising out of or in connection with a "business" engaged in by an "insured." This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed or implied to be provided because of the nature of the "business;"

   **(2)** arising out of the rental or holding for rental of any part of any premises by an "insured." This exclusion does not apply to the rental or holding for rental of an "insured location:"

   **(a)** on an occasional basis if used only as a residence;

   **(b)** in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

   **(c)** in part, as an office, school, studio or private garage.

**B.** Item **b.** is deleted and replaced by the following:

   **b.** Arising out of "business" pursuits of an "insured" or the rental or holding for rental of any premises by an "insured".

   This exclusion does not apply to:

   **(1)** Activities which are usual to non-"business" pursuits; or

   **(2)** The rental or holding for rental of an "insured location":

   **(a)** On an occasional basis if used only as a residence;

   **(b)** In part for use only as a residence unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

   **(c)** In part, as an office, school, studio, or private garage;

(Policy at 59, 70). The original unmodified Policy bifurcated the exclusion and exception, in a way that MIC contends the Policy with the Endorsement should now be read. That is, the unmodified Policy provided that there was no exception to the Business Exclusion for rental of the Premises as an office. Use of the Premises as an office was an exception only to the exclusion of coverage for operating the Premises as a rental property.

Though both parties fail to acknowledge the existence or effect of the Endorsement in their motion papers, this fact could shed light on their intent at the time

of contracting.[7]  Here, not only *could* the insurer "have phrased the provision differently," *see supra* at 14, it previously did so.  The original Policy characterized the Business and Rental Exclusions as two independent exclusions.  Indeed, the only reasonable construction of the unmodified Policy is that rental of the premises as an office (subsection 2(c)) is capable only of negating the "Rental Exclusion," and cannot save an incident that falls within the "Business Exclusion."  But that structure was superseded by the Endorsement, and creation of a single exclusion followed by a single exception.  When read together, the Endorsement and Policy—which expressly eliminate this separation—could suggest the intent to achieve the opposite and permit, rather than exclude, coverage in Qadri's favor.  *Cf. Monteleone v. Crow Constr. Co.*, 242 A.D.2d 135, 140–41 (1st Dep't 1998) ("Under the original policy exclusion contained in (2)(e), it is clear that Kalin's claim would be covered because it would come within the exception that is spelled out in the final, unnumbered sentence of that provision. Having been deprived of that exception [by the endorsement], there is no longer coverage under the policy. . . .  Clearly, the intent and inescapable effect of deleting the 'insured contract' exception is to deny coverage for all bodily injury claims, both common-law and contractual alike; to deprive the provision of this meaning would be to render it identical to its predecessor version, despite the deletion of the critical concluding sentence.").

---

[7] The Court is unable to consider this prior language in determining whether the language of the Policy is ambiguous. *See Covington Specialty Ins. Co.*, 2023 WL 2589389, at *4 ("This line of precedent squarely forecloses the Insureds' argument that the Absolute Auto Exclusion can be rendered ambiguous by reference to the standard exclusion that it 'delete[s]' and 'replace[s].'").

There may well be additional extrinsic evidence neither party has identified at this stage, or there could be none.  Either way, in the absence of any briefing on the availability of extrinsic evidence, or its potential impact on the parties' reasonable expectations at the time of contracting, the Court cannot conclusively resolve the ambiguity in favor of one party or the other.  *See supra* at 14–15; *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 650 F. App'x 70, 71 (2d Cir. 2016) ("Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate.  Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly." (quotations omitted)); *Union Ins. Soc'y of Canton, Ltd.*, 353 F.2d at 952 ("The court is not unaware of the possibility that the parties may be able to adduce but little additional competent evidence before the fact-trier on the issue of intent.  Nevertheless, sound judicial administration strongly suggests that a court should not attempt to reconstruct the intent of the parties in a complicated factual situation before they have had an opportunity to present evidence on that issue before the fact-trier.").  And, in any event, the Court need not resolve the ambiguity on summary judgment given there are also disputed issues of material fact as to whether the Premises qualifies as an "insured location" under the Office Rental Exception, as discussed below, and the "insured location" question would have to be resolved in Qadri's favor to qualify for the Office Rental Exception.  The ambiguity must be resolved at trial, by reference to any available extrinsic evidence.  The trial will be an opportunity for MIC "to shed any further light on [the ambiguity] . . . that it can through evidence on the preparation of the policy, its structure, discussions that may have

occurred with [Qadri], or any other relevant aspect of the contract formation."

*Twombly*, 199 F.3d at 25–26.[8]

MIC does contend that Qadri does not satisfy the prerequisite for the Office

Rental Exception, which requires that any rental be of an "insured location." (Pl.'s

Reply at 8–9). And MIC argues that Qadri's use of the Premises as a medical office, not

a residence, means it was not an insured location. (Pl.'s Mem. at 19–22). If true, not

only would Qadri not qualify for the Office Rental Exception but the Insured Location

Exclusion—providing that the Policy only covers insured locations—would apply, and

preclude coverage. *See, e.g.*, *Allen*, 697 F. App'x at 720 ("In view of the . . . undisputed

fact that Chambers did not reside at the insured address, MIC has no duty to defend him

in the state court action."); *Marshall v. Tower Ins. Co. of N.Y.*, 44 A.D.3d 1014, 1015 (2d

Dep't 2007) ("As the parties do not dispute that the plaintiff, the named insured under

the policy, did not reside at the subject premises, the defendant Tower Insurance

Company of New York properly concluded that the subject premises were not covered

under the policy and properly disclaimed on that basis."). On this issue, there are

disputed issues of material fact.

Under the Policy, the Premises qualifies as an "insured location" if it is "the one

family dwelling, other structures, and grounds; or that part of any other building; where

you reside and which is shown as the 'residence premises' in the Declarations." (Pl. 56.1

---

[8] At trial, MIC would bear the burden of establishing any policy exclusion applied, and Qadri would bear the burden to demonstrate the applicability of any exception to the exclusion. *Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 122 (2d Cir. 2012). But the principle of *contra proferentem*—interpreting any ambiguity remaining after considering extrinsic evidence against the contract drafter—"applies regardless of whether, as to a particular clause, the burden of proof falls on the insurer or the policyholder." *Id.* at 124.

Stmt. ¶ 9; Policy at 58; Def. 56.1 Stmt. ¶ 9).  The Policy Declarations list the Lefferts Boulevard address as the "residence premises." (*Id.* ¶ 6; Pl. 56.1 Stmt. ¶ 6).  And the Policy defines "you" as the "named insured," (Policy at 46), namely Qadri.  (Def. 56.1 Stmt. ¶ 42; Pl. 56.1 Stmt. ¶ 42).  Therefore, the Premises is only an "insured location" if Qadri resides there.  Therein lies the material factual disagreement.

Though conceding that a person can have multiple residences, (Pl.'s Mem. at 21), MIC contends that Qadri failed to meet his burden in establishing a second residence at the Premises.  The "standard for determining residency for insurance coverage requires something more than temporary or physical presence and at least some degree of permanence and intention to remain." *Allstate Ins. Co. v. Rapp*, 7 A.D.3d 302, 303 (1st Dep't 2004) (quotations omitted); *see also Covic v. Allstate Indem. Co.*, No. 6:16-CV-50, 2017 WL 5054743, at *5 (N.D.N.Y. Sept. 25, 2017) ("[Residency] refers to something more than temporary or physical presence and requires at least some degree of permanence and intention to remain, although not necessarily the intent to make that place a 'fixed and permanent home,' i.e., a domicile." (quotations and citations omitted)).  And there are competing facts in the record that make a resolution of this issue impossible on summary judgment.

On the one hand, Qadri refers to the Premises as a "one-family residence," affirmatively stating he "live[s]" in the Premises, "use[s] [it] for living," and receives personal mail there.  (Pl. 56.1 Stmt. ¶¶ 15, 55; Qadri Recorded Statement at 2–3; Qadri Decl. ¶ 10; Def. 56.1 Stmt. ¶¶ 15, 55).  His wife occasionally stays with him.  (*Id.* ¶ 59; Pl. 56.1 Stmt. ¶ 59).  And together, they stay at the living quarters—in both the basement and on the top floor—which include a living area, kitchen, bedroom, and full bathroom. (*Id.* ¶¶ 46–48, 58, 60; Qadri Recorded Statement at 5; Def. 56.1 Stmt. ¶¶ 46–48, 58, 60).

Indeed, photographs of the living quarters show the living area as furnished and decorated, and there are appliances and household items in plain view.  (*See* Photographs, attached as Exs. 1–4 to Qadri Decl.).

On the other hand, there is evidence suggesting Qadri does not reside at the Premises.  For one thing, Qadri has stated that his "home" address—including "where [he] reside[s]" and "get[s] all the mail"—is 191-11 Foothill Avenue.  (Qadri Recorded Statement at 2; Pl. 56.1 Stmt. ¶ 14; Def. 56.1 Stmt. ¶ 14; *see also* Qadri Dep. at 35:17–20 (Q: "Did you come to your practice later on in that day?"  A: "I was there before it happened and I went home.  I didn't come back.")).  He says he only stays at the Premises "on the weekend sometimes" and "sometimes . . . in the week, depend[ing] on the workload," (Def. 56.1 Stmt. ¶¶ 18, 59; Pl. 56.1 Stmt. ¶¶ 18, 59), which MIC argues demonstrates his overnight stays are merely transitory.  (*Id*. ¶ 59).  Referring at one point to the Premises as a "warehouse," Qadri says he uses the top floor for "storage," including for business purposes.  (*Id*. ¶¶ 15, 48; Def. 56.1 Stmt. ¶¶ 15, 48).  And he admits the basement—where the bedroom is located—is only accessible through Quality Medical, the commercial tenant occupying the Premises pursuant to the Lease.  (*Id*. ¶¶ 30–31, 39; Pl. 56.1 Stmt. ¶¶ 30–31, 39).

In essence, each side has identified favorable facts in the record—specifically, in Qadri's Recorded Statement—which it believes are most favorable to its position.  A reasonable factfinder could come out either way on the question of whether Qadri "resided" at the Premises.  The tension between these competing and seemingly contradictory facts, none of which can be credited over the others, can only be resolved at trial.  *See, e.g.*, *Yuan v. State Farm Fire & Cas. Co.*, No. 19-CV-4921, 2022 WL 4647100, at *2 & *4 (E.D.N.Y. Oct. 1, 2022) (denying summary judgment where

plaintiff's testimony included conflictive narratives about her residence under the insurance policy because "[w]hether and when [p]laintiff is credible are questions for a fact finder [at a hearing], not for the Court to resolve at summary judgment"); *Craft v. N.Y. Cent. Mut. Fire Ins. Co.*, 152 A.D.3d 940, 942 (3d Dep't 2017) (holding the trial court erred in granting summary judgment where record presented "some evidence, which we do not weigh, supporting both sides, and different inferences are permissible from the evidence as to whether plaintiff resided at the premises" (quotations omitted)).[9]

Because the Court cannot rule, as a matter of law, on whether the Premises was Qadri's residence, it cannot grant MIC summary judgment on the issue of the inapplicability of the Office Rental Exception or the applicability of the Insured Location

---

[9] MIC's authorities suggesting that Qadri must show a higher degree of permanence to establish residence are inapposite. The question resolved in the cases cited by MIC was whether the plaintiff resided at the subject premises for purposes of establishing venue under N.Y. C.P.L.R. 503. *See, e.g.*, *Katz v. Siroty*, 62 A.D.2d 1011, 1011 (2d Dep't 1978) (granting defendant's motion "to change the venue of the action," in part because "plaintiff's testimony on the issue of his claimed (second) residence," adduced "[a]t the hearing held pursuant to this court's remand," was "evasive and unconvincing"); *Samuel v. Green*, 276 A.D.2d 687, 687 (2d Dep't 2000) ("The evidence submitted by the plaintiffs was insufficient to establish, for the purpose of venue, that the plaintiffs had a second residence in Kings County."); *Siegfried v. Siegfried*, 92 A.D.2d 916, 916–17 (2d Dep't 1983) ("In the instant case there was no evidence adduced at the residency hearing . . . to indicate that prior to the commencement of this action plaintiff had continuously, or even on a steady basis, remained in Nassau County . . . . Accordingly, since plaintiff was not a resident of Nassau County, defendant's motion is granted to the extent of changing the venue to Westchester County, the county in which defendant undisputedly resides."); *Hurley v. Union Tr. Co. of Rochester*, 244 A.D. 590, 594 (3d Dep't 1935) (reversing trial court's order granting "defendant's motion to change the place of trial from Albany county to Monroe county"); *Labissiere v. Roland*, 231 A.D.2d 687, 687 (2d Dep't 1996) (holding plaintiff's submissions "will not suffice to establish residency for purposes of defeating a properly brought motion to change venue" and directing venue of action to be changed from Kings County to Nassau County); (Pl.'s Mem. at 21–22; Pl.'s Reply at 9). These cases were neither decided in the context of an insurance policy nor in the posture of summary judgment.

Exclusion.  Likewise, the Court cannot rule for Qadri, as a matter of law, that he is entitled to summary judgment on his entitlement to the Exception.[10]

These issues—as well as the threshold issue of how to resolve the ambiguity in the Policy as to the applicability of the Exception to the Business and Rental Exclusions—must be resolved at a trial.

<u>CONCLUSION</u>

For the reasons stated above, the Court denies both parties' motions for summary judgment.  The parties are directed to file a joint pre-trial order consistent with this Court's Individual Practices no later than **May 30, 2023**.

SO ORDERED.

<u>/s/ *Sanket J. Bulsara*</u>  March 28, 2023
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York

---

[10] Qadri's case law on this point is also inapposite.  In *Allstate Insurance Co. v. Rapp*, a court held that a child was also a resident of his grandfather's household because the living arrangement was reflective of the required degree of permanency, and would "obviously" continue indefinitely.  7 A.D.3d at 303.  In doing so, it reasoned: "The correct disposition of this case turns, not as petitioner argues, on a credibility determination reserved exclusively to the hearing court but, rather, on a point of law, namely, the recognition that respondent could, for insurance purposes, be a resident of more than one household."  *Id.* at 304.  Here, MIC acknowledges a party can have multiple residences, but the issue is whether the Premises is such a second residence.